**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **ONE-E-WAY, INC.,** | |
| **Plaintiff,** | **Civil Action No. 1:24-cv-01559** |
| **v.** | **Jury Trial Demanded** |
| **ANKER INNOVATIONS, LTD.,** | |
| **Defendant.** | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff One-E-Way, Inc. ("One-E-Way" or "Plaintiff") hereby files its Original Complaint against Defendant Anker Innovations, Ltd. ("Anker" or "Defendant") alleging infringement of U.S. Patent Nos. 10,129,627, 10,468,047, 9,107,000 (collectively the "Patents-in-Suit").

## I.    PARTIES

1.    Plaintiff One-E-Way, Inc. is a Delaware corporation that, as of the date of this Complaint, has its principal place of business at 3016 E. Colorado Blvd. No. 70848, Pasadena, California 91107.

2.    Upon information and belief, Defendant Anker Innovations Ltd. is a corporation organized and existing under the laws of Hong Kong, with a principal place of business located at Room 1318-19, Hollywood Plaza, 610 Nathan Road, Mongkok, Kowloon, Hong Kong SAR, China 518040, where it may be served with process. Upon information and belief, Defendant Anker is authorized to do business in Texas.

**ORIGINAL COMPLAINT**

## II.  JURISDICTION AND VENUE

3.      This is an action for patent infringement which arises under the Patent Laws of the United States, in particular 35 U.S.C. §§ 271, 281, 284 and 285. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §1338(a).

4.      Upon information and belief, Defendant is subject to this Court's personal jurisdiction pursuant to due process and/or the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.042, because (1) Defendant has done and continues to do business in Texas and the Western District of Texas; (2) Defendant has committed acts of patent infringement in the State of Texas, including inducing others to commit acts of patent infringement in Texas, and/or committing at least a portion of any other infringements alleged herein.

5.      Upon information and belief, Defendant has purposefully directed its activities toward the State of Texas and purposefully availed itself of the privileges of conducting activities in the State of Texas. Plaintiff's causes of action for patent infringement arise out of and result from Defendant's contact with the State of Texas.

6.      Upon information and belief, Defendant has solicited business in the State of Texas, transacted business within the State of Texas and/or attempted to derive financial benefit from residents of the State of Texas and the residents of this District, including benefits directly related to infringement of the Patents. Defendant has placed its products and/or services into the stream of commerce throughout the United States and has been actively engaged in transacting business in Texas and in the Western District of Texas.

7.      Upon information and belief, Defendant, through subsidiaries or intermediaries (including distributors, retailers, resellers, and others), makes, imports, ships, distributes, offers

for sale, sells, uses, and advertises its products and/or services in the United States, the State of Texas, and the Western District of Texas.

8.    Alternatively, to the extent Defendant's contacts with the State of Texas and this District would not support jurisdiction under the Texas long-arm statute, Defendant is subject to Federal Long-Arm Jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because (1) Plaintiff's claim arises under federal law, (2) Defendant is not subject to jurisdiction in the courts of general jurisdiction of any state within the United States, and (3) the exercise of jurisdiction satisfies due process requirements.

9.    To the extent Defendant's contacts with the State of Texas and this District would not support jurisdiction under the Texas long-arm statute, Defendant lacks substantial contacts with any single state but has sufficient contacts with the United States. To the extent Defendant's contacts with the State of Texas and this District would not support jurisdiction under the Texas long-arm statute, Defendant is not subject to jurisdiction in the courts of general jurisdiction of any state within the United States.

10.    The Court's exercise of personal jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice because Defendant has established minimum contacts with the State of Texas or, in the alternative, the United States.

11.    Venue in the Western District of Texas is proper pursuant to 28 U.S.C. § 139l (c)(3) which provides that "a Defendant not resident in the United States may be sued in any judicial district, and the joinder of such a Defendant shall be disregarded in determining where the action may be brought with respect to other Defendants."

ORIGINAL COMPLAINT

3

### III.  FACTUAL BACKGROUND

<u>ONE-E-WAY AND THE INVENTOR</u>

12.     C. Earl Woolfork first conceived of the wireless audio inventions underlying the Patents-in-Suit in the late 1990s while he was exercising outdoors at the popular Santa Monica Steps in Los Angeles. At that time, Mr. Woolfork observed many people having their exercise routines interrupted or negatively affected by the wire(s) connecting their headphones to their respective portable audio players: "I'd see people going up and down exercising, and the cord was not only a nuisance but it was also potentially dangerous," Mr. Woolfork explained.[1] Determined to address these issues, Mr. Woolfork sought to develop a "wireless" solution that would enable people to enjoy high quality music on-the-go and be free of the complications and frustrations of headphones wire(s). Ultimately, Mr. Woolfork—who had an electrical engineering degree from the University of Southern California in Los Angeles—designed a wireless audio system that could transmit and receive high quality audio data without the physical complications caused by the conventional use of wires to transmit the audio signals. Mr. Woolfork then filed a patent application with the United States Patent and Trademark Office to protect his inventions and ultimately obtained several U.S. patents on various embodiments of his invention(s).

13.     Subsequently, in 2004, Mr. Woolfork founded One-E-Way—a small, minority-owned business—in Pasadena, California to commercialize his inventions and One-E-Way also serves as the assignee of Mr. Woolfork's patents. One-E-Way maintains a website at http://one-e-way.com/.

---

[1]     *Earl and Cedric Woolfork: CEO And CFO of One-E-Way,* US INVENTOR, https://usinventor.org/portfolio-items/earl-and-cedric-woolfork-ceo-and-cfo-of-one-e-way/    (last visited Nov. 14, 2024).



http://one-e-way.com/.

ORIGINAL COMPLAINT



One-E-Way, Inc. is an electronic products design and manufacturing Delaware Corporation with offices in Pasadena, CA. Established in 2004 we are committed to meeting the electronic needs of today's mobile society by leveraging cutting edge technology with the objective of becoming a major participant in the wireless industry, targeting cross platform wireless business opportunities.

Our goal is to provide innovative, convenient and affordable consumer electronic products in the domestic and international market. Our emphasis is on creating solutions that provide performance and value.

One-E-Way's initial product is a new and innovative, Made in the U.S.A., media player accessory. It is a wireless digital stereo device with high quality sound, designed for seamless wireless connectivity to most portable MP3 player, laptop computer, tablet pc, cell phones, smart watches and other portable audio devices. It provides high quality wireless digital sound that allows the mobile user to enjoy music, movies, gaming and other audio sounds without a cable or cord to limit his/her mobility.

Our wireless digital audio system may be utilized with devices such as, iPhone, Apple Watch, iPad, Android mobile devices, Smart Watches, Windows mobile devices, tablets, portable gaming devices, laptops etc. and serves as a stand-alone accessory for easy cross platform connectivity to existing portable/mobile devices.

As a result of our extensive research and development in the area of wireless communication, One-E-Way has been awarded significant U.S. patents.

Here is a list of One-E-Way's eight issued United States Patents:

1. 7,412,294
2. 7,684,885
3. 7,865,258
4. 8,131,391
5. 9,107,000
6. 9,282,396
7. 10,129,627
8. 10,468,047

http://one-e-way.com/about-us/.

ORIGINAL COMPLAINT

14.    One-E-Way's initial commercial product was a wireless digital audio accessory designed to easily connect with a variety of portable audio devices—e.g. MP3 players, laptops, tablets, and smartphones—to deliver high-quality, wireless audio for users to enjoy their music, movies, games, and more. One-E-Way sells its patented wireless audio products at least through its online retail outlet https://shop.wayvz.com/.



https://shop.wayvz.com/.

<u>PATENTS-IN-SUIT</u>

15.    One-E-Way is the owner of all right, title, and interest in and to U.S. Patent No. 10,129,627, entitled "Wireless Digital Audio Music System," (the "'627 Patent") with a claim of priority to December 21, 2001. The '627 Patent duly and legally issued on November 13, 2018.

ORIGINAL COMPLAINT

16.     One-E-Way is the owner of all right, title, and interest in and to U.S. Patent No. 10,468,047, entitled "Wireless Digital Audio Music System," (the "'047 Patent") with a claim of priority to December 21, 2001. The '047 Patent duly and legally issued on November 5, 2019.

17.     One-E-Way is the owner of all right, title, and interest in and to U.S. Patent No. 9,107,000, entitled "Wireless Digital Audio Music System," (the "'000 Patent") with a claim of priority to December 21, 2001. The '000 Patent duly and legally issued on August 11, 2015

18.     The Patents-in-Suit are members of the same patent family and each claims priority to the parent patent application in the family—U.S. Patent Application No. 10/027,391, which was filed on December 21, 2001.

19.     The Patents-in-Suit have expired. The "Period of Exclusivity" runs from the period of enforceability until the latest expiration of the Patents-in-Suit.

TECHNICAL OVERVIEW

20.     The Patents-in-Suit are generally directed to wireless audio inventions that reduce or eliminate the conventional reliance on physical cables to transmit audio signals, and the problems associated with such cables, while still providing high quality, private listening for users and reducing interference from other device transmissions. For example, the specification of the Patents-in-Suit describes that code division multiple access technology ("CDMA") "may be used to provide each user independent audible enjoyment." *See* '627 Patent, 3:30-32. Further, the patented inventions address interference in the wireless audio spectrum by using, for example, differential phase shift keying and processing for reduction of intersymbol interference. *See, e.g., id.*, 2:55-60; 5:7-8.

21.     Figures 2 and 3 of the Patents-in-Suit depict the audio transmitter and audio receiver portions, respectively, of select embodiments of the claimed wireless digital audio systems.

ORIGINAL COMPLAINT



FIG. 2

FIG. 3

'047 Patent, FIGS. 2-3.

22.    In one embodiment, the Patents-in-Suit describe the use of "a code generator 44 that may be used to create a unique user code" and the generated "unique user code" is associated with one wireless digital audio system user. *See* '627 Patent, 2:65-3:1. In one embodiment of the receiver portion, "[t]he receiver code generator 60 may contain the same unique wireless transmission of a signal code word that was transmitted by audio transmitter 20 specific to a particular user." *See id.*, 3:23-26.

<u>DEFENDANT'S ACTS</u>

23.    Anker has manufactured, used, sold, offered to sell, and imported into the United States a variety of portable or mobile wireless audio products that provide wireless transmission

ORIGINAL COMPLAINT

and/or reception of an audio signal in compliance with versions of the Bluetooth standard from the Bluetooth Special Interest Group ("Bluetooth SIG"), and that infringed the Patents-in-Suit.[2]

24.    Anker manufactured, used, sold, offered to sell, and imported into the United States portable or mobile wireless audio products that receive a wireless audio signal in accordance with a Bluetooth standard, e.g., Bluetooth 5.0, (the "Accused Products"), including, but not limited to:

- Wireless headphones, including models such as:
    - Liberty Air 2 Pro
    - Liberty 2 Pro
    - Liberty Air 2 Pro Upgraded Version
    - Liberty Air 2
    - Liberty Neo
    - Liberty 2
    - Life Q35
    - Life Q30
    - Life Q20
    - Life Q 20+
    - Life P3
    - Life P2
    - Life P2 Mini
    - Life Dot 2
    - Life A1
    - Life A2 NC
    - Spirit X2
    - Spirit Dot 2.
- Wireless speakers, including models such as:
    - Motion +
    - Motion Boom
    - Trance
    - Trance Go
    - Flare 2
    - Flare +
    - Flare
    - Flare Mini
    - Infini Pro
    - Soundcore Mini 3
    - Soundcore 3

---

[2]  Anker Innovations Limited is an "Associate" member of Bluetooth SIG. *See* https://www.bluetooth.com/develop-with-bluetooth/join/member-directory/. Bluetooth SIG is the organization that oversees the development of Bluetooth standards.

ORIGINAL COMPLAINT

o Wakey.

The Accused Products meet all claim limitations of at least claim 1 of the '047 Patent, at least claim 1 of the '627 Patent, and least claim 9 of the '000 Patent and thus Anker's manufacture, use, sale, offer for sale, and importation into the United States of the Accused Products infringed at least claim 1 of the '047 Patent and the '627 Patent, and at least claim 9 of the '000 Patent.

25.    The Accused Products are Bluetooth-compatible products that comprise a portable or mobile digital audio spread spectrum audio receiver.

26.    The receivers of the Accused Products receive a unique user code, e.g., BD_ADDR and unique user-friendly name ("UFN"), from a digital audio spread spectrum transmitter during, e.g., device discovery, pairing, and/or audio streaming.

### 3.2.2 Bluetooth Device Name (the user-friendly name)

#### 3.2.2.1 *Definition*

The Bluetooth device name is the user-friendly name that a Bluetooth device exposes to remote devices. For a device supporting the BR/EDR device type, the name is a character string returned in the LMP_name_res in response to an LMP_name_req. For a device supporting the LE-only device type, the name is a character string held in the Device Name characteristic as defined in Section 12.1.

BLUETOOTH CORE SPECIFICATION, Version 5.0  Vol. 3, Part C, Section 3.2.2, p. 1988, available at https://www.bluetooth.com/specifications/specs/core-specification-amended-5-0/; *see also id.*, Section 6, pp. 2022-30; Section 7.1-7.7, pp. 2031-38 (discussing protocols for obtaining the BD_ADDR and UFN); Vol. 2, Part E, Section 6.23, p. 749 ("The user-friendly Local Name provides the user the ability to distinguish one BR/EDR Controller from another."); *id.*, Part B, Section 1.2.1, p. 357 (discussing a "user BD_ADDR"). For example, a unique user code is sent by the transmitter in response to the "Remote_Name_Request" command.

ORIGINAL COMPLAINT

### 7.1.19  Remote Name Request Command

| Command | OCF | Command Parameters | Return Parameters |
|---|---|---|---|
| HCI_Remote_Name_Request | 0x0019 | BD_ADDR,<br>Page_Scan_Repetition_Mode,<br>Reserved,<br>Clock_Offset | |

**Description:**

The Remote_Name_Request command is used to obtain the user-friendly name of another BR/EDR Controller. The user-friendly name is used to enable the user to distinguish one BR/EDR Controller from another. The BD_ADDR command parameter is used to identify the device for which the user-friendly name is to be obtained. The Page_Scan_Repetition_Mode parameter specifies the page scan repetition mode supported by the remote device with the BD_ADDR. This is the information that was acquired during the inquiry process. The Clock  Offset parameter is the difference between its own clock

BLUETOOTH CORE SPECIFICATION, Version 5.0  Vol. 2, Part E, Section 7.1.19, p. 800, available at

https://www.bluetooth.com/specifications/specs/core-specification-amended-5-0/.

27.    Users of a Bluetooth-compatible transmitter and the Accused Products could

change or customize the UFN of the Bluetooth-compatible device, for example as indicated below.

### 12.1   DEVICE NAME CHARACTERISTIC

The Device Name characteristic shall contain the name of the device as an UTF-8 string as defined in Section 3.2.2. When the device is discoverable, the Device Name characteristic value shall be readable without authentication or authorization. When the device is not discoverable, the Device Name Characteristic should not be readable without authentication or authorization. The Device Name characteristic value may be writable. If writable, authentication and authorization may be defined by a higher layer specification or be implementation specific.

BLUETOOTH CORE SPECIFICATION, Version 5.0  Vol. 3, Part C, Section 12.1, p. 2089, available at
https://www.bluetooth.com/specifications/specs/core-specification-amended-5-0/.

ORIGINAL COMPLAINT



FAQ section of the webpage for the Soundcore Flare+ portable speaker,
https://web.archive.org/web/20210411045716/https://us.soundcore.com/products/a3162
(captured April 11, 2021 by the Internet Archive's Wayback Machine).

28.    The digital audio spread spectrum receivers of the Accused Products also receive a

high-quality audio signal representation with a frequency range of 20 Hz to 20kHz (i.e. the range

of sound frequencies that the average human can hear high quality music) from another Bluetooth-

compatible device with a digital audio spread spectrum transmitter.

29.    Further, the receivers of the Accused Products are able to communicate wirelessly

with digital audio spread spectrum transmitters and receive audio signal representations

representative of audio from an audio source, e.g., music streamed from a Bluetooth-compatible

smartphone to an Accused Product via a Bluetooth connection between the two devices.

**ORIGINAL COMPLAINT**



SOUNDCORE 3 USER MANUAL, available at
http://web.archive.org/web/20210809183713/https://dix7fd4yse9rd.cloudfront.net/s/Soundcore/product/6109039755454/files/1617677025701_soundcorea3117umwebv0320210331.pdf
(captured August 9, 2021 by the Internet Archive's Wayback Machine).

30.      The digital audio spread spectrum receivers of the Accused Products include direct

conversion modules that can receive wireless spread spectrum signal transmissions representative

of the unique user code and the high-quality audio signal representation. For example, on

information and belief, all later Bluetooth-compatible devices include a direct conversion module

comprising down conversion circuitry. Additionally, the received transmissions are encoded for

further noise immunity. For example, the received transmissions can be encoded using various spread spectrum techniques to avoid interference, one such spread spectrum technique used is adaptive frequency hopping ("AFH"):

> ## 7.2   ADAPTIVE FREQUENCY HOPPING
>
> Adaptive Frequency Hopping (AFH) allows Bluetooth devices to improve their immunity to interference from and avoid causing interference to other devices in the 2.4 GHz ISM band. The basic principle is that Bluetooth channels are classified into two categories, *used* and *unused*, where used channels are part of the hopping sequence and unused channels are replaced in the hopping sequence by used channels in a pseudo-random way. This classification

BLUETOOTH CORE SPECIFICATION, Version 5.0  Vol. 1, Part A, Section 7.1, p. 258, available at https://www.bluetooth.com/specifications/specs/core-specification-amended-5-0/.   Additionally, Bluetooth-compatible devices can use pulse shaping to reduce intersymbol interference ("ISI"). BLUETOOTH CORE SPECIFICATION, Version 5.0  Vol. 2, Part A, Section 3.2.1.3, p. 331, available at https://www.bluetooth.com/specifications/specs/core-specification-amended-5-0/.

31.    As discussed above, the digital audio spread spectrum receivers of the Accused Products are able to process the high quality audio signals, which have frequency ranges of 20 Hz to 20 kHz.

32.    Also, the digital audio spread spectrum receivers of the Accused Products necessarily include digital-to-analog converters ("DAC") to convert the digital information in the received audio signal to corresponding analog information in order to generate an audio output.

33.    The Accused Products include one or more speakers that operate to reproduce the generated audio output. For example, the Soundcore Flare+ and Soundcore 3 wireless speakers each include a pair of speakers for audio playback.

ORIGINAL COMPLAINT



**Flare+**

Amplify the Atmosphere

- 360° sound: two back-to-back full-range drivers are combined with dual passive bass radiators and tweeters to deliver 25W of all-around sound with breathtaking clarity.
- Bass up technology: Precision EQ adjustment and driver configuration injects low end power for heart-thumping Beats.
- Beat-driven light show: a halo of LEDs reacts and phases in time with the beat—multiple themes and illumination patterns can be customized via the sound core app.
- Waterproof: ipx7-rated casing offers impermeable protection, even during complete submersion.
- Wireless stereo: connect 2 flare+ speakers via a single device for seamless stereo sound or double the volume.

http://web.archive.org/web/20210123205308/https://us.soundcore.com/collections/portable/products/a3162 (captured January 23, 2021 by the Internet Archive's Wayback Machine).



**Soundcore 3**

- Upgraded Driver Technology: Soundcore 3 Bluetooth speaker has dual drivers with 100% pure titanium diaphragms that extend treble up to 40kHz and minimize distortion.
- Enhanced Bass: Dual passive radiators and upgraded BassUp technology work in tandem to pump up the bass in real-time—even at low volumes.
- 16W Stereo Sound: Soundcore 3's stereo sound makes your music sound more immersive and pumps up the atmosphere in both indoors and outdoor spaces.

https://web.archive.org/web/20210123205843/https://us.soundcore.com/collections/portable/products/soundcore3 (captured January 23, 2021 by the Internet Archive's Wayback Machine).

The one or more speakers of the Accused Products only reproduce audible audio content sent from the digital audio spread spectrum transmitter in a Bluetooth-compatible device "paired" with the respective Accused Product.

34.    The digital audio spread spectrum receivers of the Accused Products use independent code division multiple access communication and the received unique user code to communicate only with the digital audio spread spectrum transmitter in a Bluetooth-compatible device "paired" with the respective Accused Product during a wireless connection. For example, the Bluetooth specification is based on a type of code-division multiple access ("CDMA") known

ORIGINAL COMPLAINT

16

as frequency hopping code division multiple access ("FH-CDMA"). *See, e.g.,* Jaap Haartsen, IEEE 2000, page 8; Shehu Hassan Ayagi, *Performance Analysis of Bluetooth Network in the Presence of Wi-Fi System*, COMPUTER ENGINEERING AND INTELLIGENT SYSTEMS, Vol. 5, No. 9, 2014

35.    The digital audio spread spectrum receivers of the Accused Products demodulate received modulated transmissions in order to generate a demodulated signal and the demodulation includes at least one of a differential phase shift keying ("DPSK") demodulation and a non-DPSK demodulation.

| Acronym or abbreviation | Writing out in full | Comments |
|---|---|---|
| DPSK | Differential Phase Shift Keying | Generic description of Enhanced Data Rate modulation |

BLUETOOTH CORE SPECIFICATION, Version 5.0  Vol. 1, Part B, Acronyms and Abbreviations, p. 269, available at https://www.bluetooth.com/specifications/specs/core-specification-amended-5-0/.



The general Enhanced Data Rate packet format is shown in Figure 1.3. Each packet consists of 6 entities: the access code, the header, the guard period, the synchronization sequence, the Enhanced Data Rate payload and the trailer. The access code and header use the same modulation mode as for Basic Rate packets while the synchronization sequence, the Enhanced Data Rate payload and the trailer use the Enhanced Data Rate modulation mode. The guard time allows for the transition between the modulation modes.

| ACCESS CODE | HEADER | GUARD | SYNC | ENHANCED DATA RATE PAYLOAD | TRAILER |
|---|---|---|---|---|---|

*Figure 1.3:  Standard Enhanced Data Rate packet format*

BLUETOOTH CORE SPECIFICATION, Version 5.0  Vol. 2, Part B, Baseband Specification, p. 355, available at https://www.bluetooth.com/specifications/specs/core-specification-amended-5-0/.

36.     Anker has provided instructions to its customers and users on how to pair the Accused Products with other Bluetooth-compatible products to wirelessly send and receive audio signal representations and unique user codes as claimed in the Patents-in-Suit:

- The user manuals and drivers for the Accused Products that were available on the "Documents and Drivers" webpages of https://us.soundcore.com.  For example, the Soundcore 3 User Manual, available at http://web.archive.org/web/2021 0809183713/https://dix7fd4yse9rd.cloudfront.net/s/Soundcore/product/61090397554 54/files/1617677025701_soundcorea3117umwebv0320210331.pdf (captured August 9, 2021 by the Internet Archive's Wayback Machine).

- The FAQ sections of the respective product pages for the Accused Products that were available on https://us.soundcore.com, including the "How-To Videos" that were available for a portion of the Accused Products. For example, portions of the FAQ section for the Liberty 2 headphones are shown below.



https://web.archive.org/web/20210707172534/https://us.soundcore.com/products/liberty-2 (captured July 7, 2021 by the Internet Archive's Wayback Machine).



https://web.archive.org/web/20210707172534/https://us.soundcore.com/products/liberty-2 (captured July 7, 2021 by the Internet Archive's Wayback Machine).

- The instructional videos posted by Anker on its YouTube channel at https://www.youtube.com/@AnkerOfficial/videos. For example, the instructional video below taught users how to pair the Liberty 2 headphones with a Bluetooth-compatible phone.



https://www.youtube.com/watch?v=BIUvliBmAYw (uploaded to YouTube by Anker on October 23, 2019).

37.     On information and belief, Defendant also implemented contractual controls and protections in the form of license and use restrictions with their customers to preclude the unauthorized reproduction, distribution, and modification of their products.

38.     Moreover, on information and belief, Defendant implemented technical precautions to attempt to thwart customers who would circumvent the intended operation of Defendant's products.

NOTICE

39.     Anker received notice of its infringement of the Patents-in-Suit via its receipt of a letter from One-E-Way dated November 21, 2019, which was delivered to Anker by FedEx on November 22, 2019, and also emailed to Anker Innovations. As stated in the letter, the purpose of the November 21, 2019 letter was "to address infringement of One-E-Way's patents by initiating a patent licensing discussion with the aim of avoiding patent infringement litigation." The November 21, 2019 letter to Anker explained, in part, that

Bluetooth-compatible products by Anker (including those sold under the Soundcore name) have been made, offered and sold for some time and continue to be made and sold, including:

**Anker**
- **Earbud Products**: SoundBuds Sport NB10, SoundBuds Slim, SoundBuds Curve, SoundBuds Surge, SoundBuds Flow, SoundBuds Slim+, SoundBuds Verve, ZOLO Liberty, Liberty Neo and Liberty+ earbud products
- **Wireless Speaker Products**: SoundCore Sport, SoundCore, Premium, SoundCore Mini, SoundCore 2, SoundCore Boost, SoundCore Pro+, SoundCore Motion B and SoundCore Select wireless speaker products

**Soundcore**
- **Headphone Products**: Space NC, Life Q10 and Life Q20 headphone products
- **Earbud Products**: Spirit, Spirit Pro, Spirit X, Liberty Neo, Liberty+, Liberty Air, Liberty 2 Pro, Spirit Dot 2, Spirit X2, Liberty Air 2, Liberty 2 and Life P2 earbud products
- **Wireless Speaker Products**: Flare, Flare+, Flare Mini, Rave, Rave Mini, Mini 2, Motion Q, Icon+, Model Zero, Wakey, Motion+, Infini, Infini Pro and Infini Mini wireless speaker products

The conduct of making, offering and selling such products in the United States constitutes infringement of One-E-Way's patents, namely the '258, '391, '000, '396, '627 and '047 patents. One-E-Way does not assert patent infringement lightly, but rather does so based on years of experience, thorough research and expert analysis. Moreover, litigation-based testing of One-E-Way's patents, as

40.    One-E-Way has complied with the requirements of 35 U.S.C §287 with respect to each of the Patents-in-Suit, including by providing written notice of infringement in accordance therewith.

41.    Given Defendant's knowledge of the Patents-in-Suit, Defendant knew or was willfully blind to the fact that its products infringed the Patents-in-Suit.

### IV.  PATENT INFRINGEMENT

### COUNT I — INFRINGEMENT OF U.S. PATENT NO. 10,129,627

42.    One-E-Way incorporates by reference the foregoing paragraphs as if fully set forth herein.

43.    Anker has directly infringed and has induced or contributed to the infringement of at least claim 1 of the '627 Patent in this judicial district and elsewhere in the United States by, among other things, having made, imported, used, offered for sale, and/or sold without authority of license the claimed systems of the '627 Patent.

44.     One-E-Way alleges that each and every element is literally present in the Accused Products. To the extent not literally present, One-E-Way reserves the right to proceed under the doctrine of equivalents.

45.     Anker has also actively induced the infringement of the '627 Patent under 35 U.S.C. § 271(b) by customers and other users. With knowledge of the '627 Patent (at least as of the date of its receipt of the November 21, 2019 letter), Anker actively directed and aided its customers regarding how to use the Accused Products in an infringing manner and did so with the intent to encourage its customers and users to directly infringe the '627 Patent. This direction and aid came from Anker's provision of the Accused Products along with software, guides, manuals, tutorials, and other documentation and instruction (including, by way of example, information located in the respective user manuals for the Accused Products that were available at the respective product pages on the "Documents and Drivers" section of https://us.soundcore.com and the FAQ sections of the respective product pages on https://us.soundcore.com, as described above). Anker's direction and aid was further found in the firmware and source code embedded in the Accused Products that directed and executed the direct infringement of the '627 Patent.

46.     Anker has also contributed to the infringement of one or more claims of the '627 Patent under 35 U.S.C. § 271(c) and/or 271(f), either literally and/or under the doctrine of equivalents, by having sold, offered for sale, and/or imported into the United States the Accused Products. Anker knew that the components of the Accused Products: constituted a material part of the inventions claimed in the '627 Patent; were especially made or adapted to infringe the '627 Patent; and were not staple articles or commodities of commerce suitable for non-infringing use, but rather the components were used for or in systems that infringed one or more claims of the '627 Patent. The hardware and/or software components were not a staple article or commodity of

ORIGINAL COMPLAINT

commerce because they were specifically designed to perform the claimed functionality. These products are specifically designed for their infringing purpose, namely operating as part of a wireless digital audio system to wirelessly transmit and/or receive representations of an audio signal between corresponding transmitters and receivers, in part, via the use of a unique user code in accordance with the claims of the '627 Patent. Any other use of the hardware and/or software components would have been unusual, far-fetched, illusory, impractical, occasional, aberrant, and/or experimental.

47.    One-E-Way has been damaged as a result of Anker's infringing conduct. Anker is thus liable to One-E-Way in an amount that adequately compensates it for Anker's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

<u>COUNT II — INFRINGEMENT OF U.S. PATENT NO. 10,468,047</u>

48.    One-E-Way incorporates by reference the foregoing paragraphs as if fully set forth herein.

49.    Anker has directly infringed and has induced or contributed to the infringement of at least claim 1 of the '047 Patent in this judicial district and elsewhere in the United States by, among other things, having made, imported, used, offered for sale, and/or sold without authority of license the claimed systems of the '047 Patent.

50.    One-E-Way alleges that each and every element is literally present in the Accused Products. To the extent not literally present, One-E-Way reserves the right to proceed under the doctrine of equivalents.

51.    Anker has also actively induced the infringement of the '047 Patent under 35 U.S.C. § 271(b) by customers and other users. With knowledge of the '047 Patent (at least as of the date

of its receipt of the November 21, 2019 letter), Anker actively directed and aided its customers regarding how to use the Accused Products in an infringing manner and did so with the intent to encourage its customers and users to directly infringe the '047 Patent. This direction and aid came from Anker's provision of the Accused Products along with software, guides, manuals, tutorials, and other documentation and instruction (including, by way of example, information located in the respective user manuals for the Accused Products that were available at the respective product pages on the "Documents and Drivers" section of https://us.soundcore.com and the FAQ sections of the respective product pages on https://us.soundcore.com, as described above). Anker's direction and aid was further found in the firmware and source code embedded in the Accused Products that direct and execute the direct infringement of the '047 Patent.

52. Anker has also contributed to the infringement of one or more claims of the '047 Patent under 35 U.S.C. § 271(c) and/or 271(f), either literally and/or under the doctrine of equivalents, by having sold, offered for sale, and/or imported into the United States the Accused Products. Anker knew that the components of the Accused Products: constituted a material part of the inventions claimed in the '047 Patent; were especially made or adapted to infringe the '047 Patent; and were not staple articles or commodities of commerce suitable for non-infringing use, but rather the components were used for or in systems that infringed one or more claims of the '047 Patent. The hardware and/or software components are not a staple article or commodity of commerce because they are specifically designed to perform the claimed functionality. These products were specifically designed for their infringing purpose, namely operating as part of a wireless digital audio system to wirelessly transmit and/or receive representations of an audio signal between corresponding transmitters and receivers, in part, via the use of a unique user code in accordance with the claims of the '047 Patent. Any other use of the hardware and/or software

components would have been unusual, far-fetched, illusory, impractical, occasional, aberrant, and/or experimental.

53.    One-E-Way has been damaged as a result of Anker's infringing conduct. Anker is thus liable to One-E-Way in an amount that adequately compensates it for Anker's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

COUNT III — INFRINGEMENT OF U.S. PATENT NO. 9,107,000

54.    One-E-Way incorporates by reference the foregoing paragraphs as if fully set forth herein.

55.    Anker has directly infringed and has induced or contributed to the infringement of at least claim 9 of the '000 Patent in this judicial district and elsewhere in the United States by, among other things, having made, imported, used, offered for sale, and/or sold without authority of license the claimed systems of the '000 Patent

56.    The infringing products include the Accused Products. One-E-Way alleges that each and every element is literally present in the Accused Products. To the extent not literally present, One-E-Way reserves the right to proceed under the doctrine of equivalents.

57.    Anker has also actively induced the infringement of the '000 Patent under 35 U.S.C. § 271(b) by customers and other users. With knowledge of the '000 Patent (at least as of the date of its receipt of the November 21, 2019 letter), Anker actively directed and aided its customers regarding how to use the Accused Products in an infringing manner and did so with the intent to encourage its customers and users to directly infringe the '000 Patent. This direction and aid came from Anker's provision of the Accused Products along with software, guides, manuals, tutorials, and other documentation and instruction (including, by way of example, information located in the

ORIGINAL COMPLAINT

respective user manuals for the Accused Products that were available at the respective product pages on the "Documents and Drivers" section of https://us.soundcore.com and the FAQ sections of the respective product pages on https://us.soundcore.com, as described above). Anker's direction and aid was further found in the firmware and source code embedded in the Accused Products that directed and executed the direct infringement of the '000 Patent.

58.     Anker has also contributed to the infringement of one or more claims of the '000 Patent under 35 U.S.C. § 271(c) and/or 271(f), either literally and/or under the doctrine of equivalents, by having sold, offered for sale, and/or imported into the United States, the Accused Products. Anker knew that the components of the Accused Products: constituted a material part of the inventions claimed in the '000 Patent; were especially made or adapted to infringe the '000 Patent; and were not staple articles or commodities of commerce suitable for non-infringing use, but rather the components were used for or in systems that infringed one or more claims of the '000 Patent. The hardware and/or software components were not a staple article or commodity of commerce because they were specifically designed to perform the claimed functionality. These products were specifically designed for their infringing purpose, namely operating as part of a wireless digital audio system to wirelessly transmit and/or receive representations of an audio signal between corresponding transmitters and receivers, in part, via the use of a unique user code in accordance with the claims of the '000 Patent. Any other use of the hardware and/or software components would have been unusual, far-fetched, illusory, impractical, occasional, aberrant, and/or experimental.

59.     One-E-Way has been damaged as a result of Anker's infringing conduct. Anker is thus liable to One-E-Way in an amount that adequately compensates it for Anker's infringements,

ORIGINAL COMPLAINT

which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### V.  WILLFULNESS

60.    Anker was provided notice of One-E-Way's claims at least by way of the November 21, 2019 letter.

61.    Anker acted with knowledge of the Patents-in-Suit despite an objectively high likelihood that its actions constituted infringement of One-E-Way's valid patent rights.

62.    This objectively defined risk was either known or so obvious that it should have been known to Anker. One-E-Way seeks enhanced damages pursuant to 35 U.S.C. §284.

### VI.  JURY DEMAND

63.    One-E-Way demands a trial by jury of all matters to which it is entitled to trial by jury, pursuant to FED. R. CIV. P. 38.

### VII.  PRAYER FOR RELIEF

64.    WHEREFORE, Plaintiff One-E-Way prays for judgment and seeks relief against Defendant as follows:

a.    Judgment that one or more claims of the Patents-in-Suit have been directly and/or indirectly infringed, either literally and/or under the doctrine of equivalents;

b.    Award Plaintiff past damages together with prejudgment and post-judgment interest to compensate for the infringement by Anker of the Patents-in-Suit in accordance with 35 U.S.C. § 284, and increase such award by up to three times the amount found or assessed in accordance with 35 U.S.C. § 284;

c.    That the Court declare this an exceptional case and award Plaintiff its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and

ORIGINAL COMPLAINT

d.     That Plaintiff be granted such other and further relief as the Court may deem just

and proper under the circumstances.


Dated: December 18, 2024                    Respectfully submitted,

                                            */s/ Andrew G. DiNovo*
                                            Andrew G. DiNovo
                                            Texas State Bar No. 00790594
                                            Adam Price
                                            Texas State Bar No. 24027750
                                            Daniel L. Schmid
                                            Texas State Bar No. 24093118
                                            **DiNovo Price LLP**
                                            7000 N. MoPac Expressway, Suite 350
                                            Austin, Texas 78731
                                            Telephone: (512) 539-2626
                                            Telecopier: (512) 727-6691
                                            adinovo@dinovoprice.com
                                            aprice@dinovoprice.com
                                            dschmid@dinovoprice.com


                                            **ATTORNEYS FOR PLAINTIFF**
                                            **ONE-E-WAY, INC.**

ORIGINAL COMPLAINT